# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

JOHN W.[1],

Plaintiff,

v.                                      1:18-CV-177 (ATB)

COMMISSIONER OF SOCIAL SECURITY,

Defendant.

JOHN W., Plaintiff pro se
ARIELLA ZOLTAN, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## MEMORANDUM-DECISION and ORDER

This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 4, 8).

## I.  PROCEDURAL HISTORY

Plaintiff received Supplemental Security Income ("SSI") benefits as a child due to Attention Deficit and Hyperactivity Disorder ("ADHD") and a tic disorder. (T. 85). Plaintiff reached 18 years of age on March 19, 2015. (*Id.*)  According to the Social Security Regulations, the Commissioner is required to reevaluate the plaintiff's disability when he reaches 18 under the regulations used to determine disability in

---

[1] In accordance with recent guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which was adopted by the Northern District of New York in June 2018 in order to better protect personal and medical information of non-governmental parties, this Memorandum-Decision and Order will identify the plaintiff using only her first name and last initial.

adults. 20 C.F.R. § 416.987. Upon review, the Commissioner determined that plaintiff was no longer disabled as of July 31, 2015. (T. 56-63).

Plaintiff was notified that he would no longer receive benefits as of September 30, 2015. (T. 56). This determination was upheld on reconsideration. (T. 79-90). Plaintiff requested a hearing which was held on November 23, 2015 before Administrative Law Judge Arthur Patane. (T. 28-52). Plaintiff and his mother testified at the hearing. (*Id.*) On December 28, 2016, ALJ Patane issued his decision, finding that plaintiff's disability ended on September 30, 2015, and that he had not become disabled again since that date. (T. 14-22). The ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on December 7, 2017. (T. 1-6).

## II.    **GENERALLY APPLICABLE LAW**

### A.    **Disability Standard**

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be

2

hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner ] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

**B. Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence

is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III.  FACTS

Plaintiff was granted SSI benefits with an onset date of November 10, 2009,

based on a diagnosis of ADHD and a tic disorder. (T. 85). On October 31, 2013, one of plaintiff's school counselors brought plaintiff to Ellis Hospital because plaintiff was acting confused at school and stated that he was having some suicidal ideation along with "intrusive" thoughts about stabbing his mother and his brother. At the time, plaintiff was taking Topamax, Risperdal, Intunix, and Miralax. (T. 222). In a discharge summary, dated November 18, 2013, the doctor stated that upon admission plaintiff was psychotic and had symptoms of Tourette's Syndrome. (*Id.*)

At the time of plaintiff's admission to Ellis Hospital, a crisis worker at the hospital performed a preliminary mental status examination on plaintiff. The examination revealed that plaintiff had normal speech, adequate comprehension, cooperative behavior, circumstantial and tangential thought processes, depressed and anxious mood, flat affect, and poor insight, judgment, and impulse control. (T. 226-30). Plaintiff was also having delusional, bizarre, and paranoid thoughts, together with hallucinations and suicidal ideas. (T. 226). Plaintiff was diagnosed with psychotic disorder, Tourette's Syndrome, Post Traumatic Stress Disorder ("PTSD"), and ADHD. (T. 229). The diagnosis also stated "rule out" Schizophrenia and Major Depressive Disorder with Psychotic Features. (*Id.*)

Plaintiff's medications were changed over the course of his hospitalization. His Risperdal was discontinued, and he was started on Seroquel. (T. 222). On November 14, 2013, plaintiff reported having some homicidal thoughts, but stated that he was not thinking of acting on them. (*Id.*) In addition to Seroquel, Prozac, and Intunix, the doctor re-started Topamax because plaintiff's facial tics had returned, and the tics

became less frequent within three days after the taking Topamax. (T. 222-23). While plaintiff was in the hospital, he suffered a seizure, which required his transfer to the neurology department on November 13, 2013. (T. 222). Plaintiff's discharge summary states that the seizure was likely due to the Lithium that he was given during his hospital stay and would not recur. (*Id.*) The Lithium was discontinued, and the doctor determined that no anti-seizure medication was warranted. (*Id.*)

At the time of plaintiff's discharge on November 18, 2013, he demonstrated good eye contact and was able to articulate his thoughts well. (T. 222). Over the last few days before his discharge, his mood continued to be euthymic, with a congruent affect, his thoughts remained clear, and he was not acutely psychotic. (*Id.*) His thoughts of hurting himself or others had resolved. (*Id.*) The frequency of his tics diminished after he started taking the Topamax, and the doctor indicated that he would consider slowly increasing the dosage to see if it would help further. (T. 223). Plaintiff was looking forward to going home, and returning to school. His mother indicated that she was comfortable with him returning home. (T. 223).

After plaintiff's discharge from the hospital, he followed up with his treating psychiatrist, Dr. Christopher Burky of Northeast Parent and Child Society, Inc. (T. 321). On December 12, 2013, Dr. Burky wrote that since plaintiff's discharge, he was "better," his sleep improved, and the voices were going away. (*Id.*) His school performance was better, he was not worried and anxious, and his hallucinations were not gone, but decreasing steadily. (*Id.*) There were no "commands" to hurt people. There were only "commands" to destroy his own things. (*Id.*) Dr. Burky diagnosed

ADHD, Tourette's, "Unspecified Anxiety," and Psychotic Disorder with Hallucinations. (T. 322).

In a "check-box" portion of the examination report, Dr. Burky found that plaintiff was compliant with his medications, and he suffered no side effects. (T. 322). Plaintiff was well-groomed and cooperative, and his behavior was appropriate. (T. 323). His speech was normal, and his mood was "ok." (*Id.*) The form indicates that plaintiff's tics were "absent,"[2] his language was normal, his affect was "appropriate," with "congruent mood." (*Id.*) Although there were auditory hallucinations, his thought processes were logical, and his psychomotor behavior was normal, and he was no longer having suicidal or homicidal thoughts. (*Id.*) His memory and attention were both intact, his abstract thinking was "appropriate," his judgment and insight were both "good," and his fund of knowledge was "normal." (*Id.*) Dr. Burky recommended that plaintiff continue therapy and make an appointment with his neurologist to address his worsening tics. (T. 324).

Although Dr. Burky left the Northeast Parent and Child Clinic, plaintiff continued to treat with him at Ellis Outpatient Mental Health, after plaintiff's mother requested that his care be transferred there. (T. 249-50, 341-44). Dr. Burky reevaluated plaintiff on June 30, 2014, noting that plaintiff was continuing to do "exceptionally well." (T. 252-54). Plaintiff was performing "reasonably well" at school, even though he needed to go to summer school for English and Earth Science. (T. 252). Plaintiff told the doctor that he was able to focus and pay attention, and that his difficulties in

---

[2] This entry may not be correct, because Dr. Burky noted that plaintiff's tics were worse, and that he should make an appointment with his neurologist. (T. 325).

the two classes were likely due to his "not getting along well with his teachers," and not due to being distracted. (*Id.*)

Plaintiff's mother agreed that his ADHD was under "generally good control." (*Id.*) Plaintiff stated that he no longer had obsessive thoughts or hallucinations, although he did report seeing spiders as he was waking up or falling asleep. (*Id.*) Dr. Burky found that plaintiff's behavior was cooperative, his speech was normal, his mood was good, his affect was slightly constricted, but he had logical and goal directed thought processes, with good attention, insight, judgment, and frustration tolerance. (*Id.*) Dr. Burky diagnosed ADHD, Obsessive Compulsive Disorder ("OCD"), and Tourette's Syndrome, but was not sure that plaintiff had a psychotic disorder. (T. 253). Dr. Burky found that plaintiff's "functional impairment" was "mild" with the use of medication. (T. 253).

Dr. Burky made similar findings on April 2, 2015. (T. 244). He stated that plaintiff continued to do well, and his moods were stable. (*Id.*) Plaintiff denied having mood swings, angry feelings, or harmful thoughts, and he stated that his OCD symptoms were minimal. (*Id.*) Both plaintiff and his mother reported that plaintiff's depression was under control, and that he was responding well to his ADHD medication. (T. 244). Plaintiff told Dr. Burky that he was doing well in school, with good attention, focus, and concentration, and that he was in the process of researching on-line college programs. (*Id.*) Dr. Burky found good attention, concentration, and intact recent and remote memory. (*Id.*) Plaintiff's mood was good, and his affect was "bright." (*Id.*) Plaintiff was compliant with his medications, and he was suffering no

side effects. (T. 246).

On May 15, 2015, plaintiff was examined by consultative psychologist Brett T. Hartman, Psy. D. (T. 265-60). Dr. Hartman reported that plaintiff appeared restless and had occasional facial tics. (T. 258). Dr. Hartman noted that plaintiff's speech was fluent, yet pressured, but his eye contact was appropriate. (*Id.*) Plaintiff's thought processes appeared to be coherent and goal-directed, but he may have been experiencing some paranoid ideation. Plaintiff's mood was unremarkable, and his affect was agitated. (T. 258). His attention and concentration, and recent and remote memory were "mildly impaired." His intellectual functioning was near the average range. (*Id.*)

Dr. Hartman found that plaintiff was able to understand and follow simple directions, and perform simple tasks. He had a fair ability to learn new tasks. (T. 259). Plaintiff had mild difficulty maintaining attention and concentration, maintaining a regular schedule, performing complex tasks, and making appropriate decisions. (*Id.*) Dr. Hartman also stated that plaintiff would have moderate difficulty in dealing appropriately with the normal stressors of life and relating adequately with others. He recommended individual counseling as well as vocational training upon graduation from high school. (T. 260).

Dr. M. Marks, a non-examining consultant, reviewed plaintiff's records on July 30, 2015. (T. 263-74). Relying on Dr. Hartman's report, Dr. Marks found that plaintiff's mental impairments caused only mild limitations in his ability to perform activities of daily living, and maintain concentration, persistence, and pace. (T. 263-74).

Dr. Marks also found that plaintiff would have moderate difficulties in his ability to maintain social functioning. (*Id.*) Plaintiff was not significantly limited in his abilities to understand and remember short, simple instructions; carry out short, simple instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance and be punctual; ask simple questions; accept instruction and criticism from supervisors; maintain socially appropriate behavior; respond appropriately to changes in a work setting; take appropriate precautions with normal hazards; travel to unfamiliar places; and set realistic goals and make plans independently. (T. 278-79).

Dr. Marks found moderate limitations in plaintiff's abilities to understand, remember, and carry out detailed instructions; work in coordination with others, without being distracted; make simple work-related decisions; complete a normal work day without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and get along with co-workers. (*Id.*)

Plaintiff saw Dr. Burky again on October 7, 2015. (T. 289). Dr. Burky found that plaintiff was continuing to do well, that he had started college, and that he was enjoying the course work. (T. 289). Dr. Burky's conclusions regarding plaintiff's limitations were similar to those he expressed in April of 2015. (*Id.*) On November 12, 2015, Dr. H. Ferrin, another non-examining psychological consultant issued a report, agreeing with Dr. Marks. (T. 299). Plaintiff was seen by a Nurse Practitioner on March 25, 2016 for seizure activity. (T. 303-305).

On May 26, 2015, plaintiff saw Dr. Burky for "medication follow-up." (T. 431). Plaintiff had stopped taking his Topamax, and he had one seizure "along the way." (*Id.*) Dr. Burky stated that plaintiff's neurologist would follow up on this issue. Plaintiff's ADHD symptoms were still a concern, even though he was doing well on medication. Plaintiff told Dr. Burky that he was having significant problems at school due to disorganization. (T. 431). Plaintiff's mother reported that plaintiff was having intrusive thoughts and anxiety, but plaintiff denied having these symptoms. (*Id.*) Dr. Burky's psychiatric mental exam resulted in essentially normal findings, except for some moderate facial tics. (*Id.*)

On August 26, 2016, plaintiff told Dr. Burky that he had withdrawn from college after failing his courses. (T. 428-30). Plaintiff told Dr. Burky that he was using ACCESS VR, a vocational resources organization to try to get a job. (T. 428). Plaintiff's mother stated that these efforts were much more realistic. (*Id.*) Plaintiff was benefitting from his ADHD medicine, but was still having problems with disorganization. (*Id.*) Since he left college, the disorganization involved losing items such as house keys, and Dr. Burky emphasized the importance of establishing consistent habits. Dr. Burky's clinical findings were essentially normal, except for "fairly minimal facial tics." (*Id.*)

At his October 16, 2016 ALJ hearing, plaintiff testified that he graduated from high school, taking special education courses. (T. 35). He tried college, but he "just couldn't do it." (T. 34). Plaintiff testified that he tried to get extra help in college, but his grades did not improve, and he did not pass any of his courses. (T. 39). He wanted

to succeed, but things just did not "stick." (T. 39).  Plaintiff stated that since withdrawing from college, he had been trying to find a job, but that he could not get one. (T. 34-35).  He testified that he looked in several places: Party City, Target, Wal-Mart, Staples, and "every dollar store [sic] I can think of." (T. 35).  Plaintiff stated that he submitted on-line applications, but he thought that he did not get hired because his resume was "very blank." (T. 35).

Plaintiff testified that he lived with his mother and his younger brother, and "lately" did not do "much of anything." (T. 35).  He sometimes washed the dishes, almost always took out the garbage, read books, watched Netflixs, and listened to music a lot. (T. 36).  He told the ALJ that he did not read "story books," but did read books about science, philosophy , religion, and technology that gave him "knowledge and wisdom," so that he could "become smarter." (*Id.*)  Plaintiff testified that he had "a friend." (T. 37).  He did not have a driver's licence, but did have a learner's permit and was "practicing." (*Id.*)

Plaintiff testified that he was getting treatment for his Tourette's, and that although the tics had not stopped, there was "definitely a major improvement." (*Id.*)  Plaintiff stated that he also took other medications that treated multiple conditions, including his ADHD. (T. 37-38).  Plaintiff testified that he might be able to work, depending on the job. (T. 38).  Plaintiff stated that he was "trying to talk" with someone who could help him "get an employment agent or something." (*Id.*)  Plaintiff told the ALJ that his limitations included getting nervous "a lot," getting "delusions" or "perceiv[ing] things that aren't even there." (T. 38).  Plaintiff stated that he did not tell

his psychiatrist about the delusions because he did not want to, and when he went to his doctor, he did not "remember at all." (T. 39).

Plaintiff testified that he got irritable "at times," was really "pessimistic," was always distracted, procrastinated, did not focus "much," and could not multitask. (T. 39). Plaintiff also stated that he suffered from seizures which caused him to "just freeze up." (T. 39-40). Plaintiff stated that he told his neurologist about it, and the neurologist agreed that it did "sound like a seizure." (T. 40). Plaintiff stated that sometimes he hallucinated, and that he told his doctor at Albany Medical Center about it. (T. 40).

Plaintiff's mother testified[3] that plaintiff does "a bunch of nothing" at home, and that he has job applications, but "just hasn't filled them out." (T. 45). Plaintiff interrupted, telling the ALJ that he filled his applications out "online." (T. 46). Plaintiff's mother admitted that she was not sure whether or not plaintiff had completed his applications. (T. 46). She testified that "there was some talk" about contacting an agency that would help plaintiff find work, but that she was not sure that plaintiff could work because "he gets spaced out" every day in the afternoon. (*Id.*) She thought that "it might be his meds." (T. 47).

Plaintiff's mother testified that she had to call his friends for him. (T. 47). Plaintiff had a driver's permit, and his mother took him out driving, but that sometimes it went well, and "other times it's not okay." (T. 47). She testified that plaintiff's medications were helping his Tourette's, but that the symptoms reappeared when

---

[3] (T. 45-51). Before her testimony began, she and the ALJ discussed plaintiff's desire to proceed without counsel. (T. 43-44). Plaintiff told his mother that he declined the opportunity to adjourn the hearing to obtain counsel, and after some discussion, they agreed to proceed without representation. (T. 44).

plaintiff became anxious. (T. 48). Plaintiff's mother stated that plaintiff forgot "things" when he became anxious, but that his IQ was above average, and he read technical books and books about philosophy. (T. 49). She believed that he failed college because of anxiety, not due to lack of effort. (*Id.*) She testified that "sometimes" plaintiff's memory was not good, and that it "comes and goes." (T. 50). She also stated that plaintiff does not function "at the rate that he is supposed to." (*Id.*) Finally, she stated that when plaintiff took his medication, he slept well, but that she had to remind him to take his medications. (T. 51).

## IV.   **ALJ'S DECISION**

The ALJ reviewed the procedural history of plaintiff's disability application, stating that, although plaintiff received benefits as a child, when he reached eighteen, it was determined that plaintiff was no longer disabled as of September 30, 2015. (T. 14). The ALJ also noted that the medical improvement review standard did not apply to these disability re-determinations. (*Id.*) Instead, the applicable standard was the one used for adults who file new applications for SSI. (*Id.*)

At step two of the sequential evaluation, the ALJ found that plaintiff suffered from the following severe impairments: ADHD, psychotic disorder, OCD, and Tourette's. (T. 16). The ALJ found that plaintiff's seizure disorder was not severe. Although plaintiff had some "isolated seizure episodes," the consultative neurologist reported that no anti-seizure treatment was indicated due to the low probability of a repeat seizure.[4] (T. 16). The neurologist opined that the seizure was due to the

---

[4] The ALJ noted that plaintiff confirmed at his 2016 hearing that he had experienced only two more seizures in the three years following the initial episode. (T. 16).

introduction of Lithium into his medication regimen.[5] (*Id.*)

At step three, the ALJ found that plaintiff's severe impairments did not meet or medically equal the severity of a Listed Impairment. (T. 17).  Although there were no adult listings for plaintiff's ADHD, OCD, or Tourette's, the ALJ considered Listing 12.03, finding that no medical source opined that the plaintiff's impairments met the listing. (*Id.*)  The ALJ also considered the broad areas of functioning, finding that plaintiff had only mild or moderate limitations.  The ALJ found that the extent of plaintiff's limitations was supported by the clinical findings of record, documented subjective reports about the efficacy of plaintiff's medication, and plaintiff's acknowledged activities of daily living. (*Id.*)

At step four of the analysis, the ALJ found that plaintiff had the RFC to perform a full range of work at all exertional levels, but is limited to performing the type of simple and detailed work tasks associated with jobs which do not involve complex tasks, and is limited to frequent, but not constant interaction with co-workers, supervisors, and the public. (T. 17).  In making his determination, the ALJ considered all the medical evidence, including reports from plaintiff's treating physician and consultative psychological reports from examining and non-examining experts. (T. 18-21).  The ALJ carefully and completely analyzed plaintiff's treating physician's reports in conjunction with the consultative physicians' examinations and medical source statements. (T. 18-20).  The ALJ considered the testimony from plaintiff and his mother, finding that it was "partially but not entirely consistent with the evidence." (T.

---

[5] The ALJ included negative EEG testing as a basis for this determination. (T. 16).

20).

At step five, the ALJ considered the Medical Vocational Guidelines[6] to determine that plaintiff could perform work in the national economy. (T. 21-22). In making this determination, the ALJ found that plaintiff's mental impairments had little or no effect on the occupational base of unskilled work at all exertional levels. (T. 21). The ALJ relied upon Social Security Ruling ("SSR") 85-15 which outlines the basic mental demands of competitive, remunerative, unskilled work. (T. 21). Based on plaintiff's ability to frequently interact with others in the workplace, "and in the absence of any other significant nonexertional limitations," the ALJ found that plaintiff was able to perform the basic mental demands of unskilled work on a "'sustained'" basis. (T. 22). The ALJ then used the Medical Vocational Guidelines ("The Grid") to find that plaintiff was "not disabled." (*Id.*)

## V.    ISSUES IN CONTENTION

Plaintiff is pro se and has not filed a brief in support of his position. However, the court will assume that by filing this action, he claims that the Commissioner's decision was not supported by substantial evidence. After an extensive review of the evidence in the record, defendant argues[7] that the Commissioner's determination was supported by substantial evidence and should be affirmed. (Def.'s Br. at 15-24) (Dkt.

---

[6] The ALJ recognized that if an individual has solely nonexertional limitations, the guidelines may not be fully applicable, but are used as a framework for decision making. (T. 21).

[7]As stated above, this court's procedure in pro se Social Security appeals in which the plaintiff fails to file a brief by the deadline contained in General Order 18 is to direct the Commissioner to file her brief first. This is done in an effort to assist plaintiff in understanding the legal standards involved as well as the defendant's argument in favor of affirmance.

No. 12). Notwithstanding plaintiff's failure to argue for reversal, it is the court's responsibility to review the record and determine whether the Commissioner's decision is properly supported. *See Corbiere v. Berryhill*, No. 18-451 (2d Cir. Jan. 23, 2019). For the following reasons, this court agrees with the defendant and will dismiss the complaint.

DISCUSSION

## VI. RFC EVALUATION/TREATING PHYSICIAN

### A. Legal Standards

#### 1. RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis . . . ." A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make

conclusory statements regarding a plaintiff's capacities. *Martone*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, No. 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7).

## 2. Treating Physician

"Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, . . . the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record . . . ." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2004); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The ALJ must properly analyze the reasons that a report of a treating physician is rejected. *Halloran*, 362 F.3d at 32-33. An ALJ may not arbitrarily substitute his own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

## B. Application

In this case, the treating physician did not complete a Medical Source Statement ("MSS") or a mental RFC form, so the ALJ evaluated Dr. Burky's treatment notes, together with the reports of examining and nonexamining consulting physicians, in an

effort to determine the plaintiff's RFC. With respect to plaintiff's physical abilities, the ALJ noted that plaintiff had a seizure in November of 2013, but the neurologist believed that the isolated seizure may have been due to a change in medication and did not believe that any anti-seizure medication was warranted at that time. (T. 222). Based on the medical evidence and plaintiff's own statement that he only had two episodes in the three years following the initial seizure, the ALJ found that this did not rise to the level of a severe impairment and would not affect plaintiff's ability to perform work at any exertional level. Plaintiff also told Dr. Hartman that he sometimes exercised and rode a bicycle. (T. 259). There is no indication in the record that plaintiff's physical abilities are limited.

With respect to plaintiff's mental abilities, the ALJ reviewed Dr. Burky's treatment notes and even quoted Dr. Burky in his decision. (T. 18). On April 2, 2015, Dr. Burky stated that plaintiff was making good progress, his moods were stable, he was showing no objective signs of OCD, and his ADHD seemed to be under good control. (T. 245). His depression was under good control, and his attention and focus were good. (T. 244). His recent and remote memory were "intact." (T. 244). There was no evidence of paranoia, delusions, or auditory of visual hallucinations. (T. 244). Plaintiff was having "some" symptoms of Tourette's which were "improved with his current medication." (T. 245). The tics were mainly motor, and did not seem to bother him "at this time." (T. 245) Plaintiff's psychiatric mental examination resulted in normal findings.[8] (T. 244).

_____

[8] The court notes that as early as June of 2014, Dr. Burky reported that plaintiff's "functional limitations" were "[m]ild with use of medications." (T. 253). In the same report, Dr. Burky declined to

The ALJ then discussed the two consultative physicians, one of whom saw the plaintiff on May 15, 2015 and the other who reviewed the plaintiff's file in July 2015. (T. 19). The ALJ stated that despite plaintiff's mental impairments, he reported "generally high functioning activities of daily living" to Dr. Hartman. (T. 19). These activities included the ability to dress, bathe, groom himself, do his own cooking, go shopping, maintain a relationship with a friend, manage his money, work on computers, play video games, read, and exercise. (T. 19, 259). Based on his examination, Dr. Hartman found that plaintiff was able to understand and follow simple directions, perform simple tasks and had a fair ability to learn new tasks. (T. 259). He did not find any marked limitations, found moderate limitations in plaintiff's ability to deal with stress and relate adequately with others, and found only mild difficulties in maintaining a schedule, maintaining attention and concentration, performing complex tasks independently, and making appropriate decisions. (*Id.*)

Psychologist Michelle Marks reviewed plaintiff's file on July 30, 2015 and issued a mental RFC evaluation in which she found that plaintiff was not significantly limited in most areas. (T. 278-80). Dr. Marks found that plaintiff had moderate limitations in the ability to understand, remember, and carry out detailed instructions; the ability to work in proximity to or coordination with others without being distracted by them; the ability to complete a normal work day without interruptions from psychologically based symptoms and perform at a consistent pace without an

---

diagnose any psychosis. He was not reporting any obsessive thoughts or compulsive behavior." (*Id.*) Although plaintiff was still suffering from significant Tourette's, with prominent facial tics, Dr. Burky stated the impairment was being managed by neurologist, Dr. Nichter. (*Id.*)

unreasonable number and length of rest periods; the ability to make simple work related decisions; and the ability to get along with coworkers without distracting them or exhibiting behavioral extremes. (T. 278-79).

Plaintiff saw Dr. Burky again on October 7, 2015. (T. 289-90). Dr. Burky stated that plaintiff had continued to do well since his last appointment. (T. 289). His moods were stable, and he had no anger problems. (*Id.*) OCD symptoms were "minimal." (*Id.*) His depression was under good control, and he was having a good response to his ADHD medication. (*Id.*) Plaintiff's attention and focus were good, and at that time, he was enjoying his college course work. (*Id.*) Plaintiff's psychiatric medical examination showed mostly normal findings. Plaintiff's mood was good, his recent and remote memory were intact, there was no evidence of paranoia, delusions or hallucinations, and his concentration and attention were "good." (*Id.*) He still had motor tics, but they did not appear to bother him. (T. 290).

In his August 26, 2016 report, Dr. Burky noted that although plaintiff was "doing better," he had withdrawn from college. (T. 428). However, Dr. Burky noted that plaintiff was currently looking for a job and seeking to utilize ACCESS-VR. (*Id.*) Dr. Burky stated that plaintiff's attempt at finding work had relieved the stress in the household and the relationship with his mother, who felt that plaintiff's track was "more realistic." (*Id.*) Dr. Burky stated that plaintiff's ADHD was still an issue, and that he was having some trouble with disorganization. (*Id.*) Dr. Burky's psychiatric medical examination continued to produce normal results. (T. 428).

The ALJ gave great weight to the opinions of Dr. Hartman and Dr. Marks, other

than their "underestimation" of plaintiff's difficulty maintaining concentration, persistence, and pace. (T. 20). The ALJ also relied on plaintiff's treating physician and plaintiff's own estimation of his abilities in determining that plaintiff could consistently perform the basic requirements of unskilled work. (T. 20). The ALJ utilized the medical reports to support his findings. To the extent that plaintiff and his mother testified to greater limitations at the hearing, the ALJ stated that their testimony was only partially, but not entirely "consistent with the evidence."[9] (*Id.*) The ALJ specifically considered plaintiff's recent difficulty with school and his withdrawal from college in his RFC finding. (T. 20-21). The ALJ weighed any conflicts in the evidence and reached a conclusion that reflected that balance. Based on the entirety of the record, including plaintiff's own testimony, the ALJ's RFC determination is supported by substantial evidence.

## V.    STEP FIVE DETERMINATION

### A.    Legal Standards

At step five of the disability analysis, the burden shifts to the ALJ to demonstrate that there is other work in the national economy that plaintiff can perform. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009). "Work which exists in the national economy" means work existing in significant numbers "either in the region where the individuals live or in several regions of the country." *McCusker v. Comm'r of Soc. Sec.*, No. 1:13-CV-1074, 2014 WL 6610025, at *3 (N.D.N.Y. Nov. 20, 2014) (quoting SSR

---

[9] The court notes that plaintiff testified that he thought he might be able to work, depending on the job, and that he assumed that he was not hired for jobs because his resumé was "very blank." (T. 35, 38). Plaintiff and his mother also testified that plaintiff was going to consult or was consulting with an agency that could help him to find work.

82-53, 1982 WL 3134, at *3 (1982) (internal quotation marks removed).

In the ordinary case, the ALJ carries out this fifth step of the sequential disability analysis by applying the applicable Medical-Vocational Guidelines ("the Grids"). *Id.* The Grids divide work into sedentary, light, medium, heavy, and very heavy categories, based on the extent of a claimant's ability to sit, stand, walk, lift, carry, push, and pull. 20 C.F.R. Pt. 404, Subpt. P, App. 2; *Zorilla v. Chater*, 915 F. Supp. 662, 667 n.2 (S.D.N.Y. 1996). *See also* 20 C.F.R. §§ 404.1567 & 416.967. Each exertional category of work has its own Grid, which then takes into account the plaintiff's age, education, and previous work experience. *Id.* Based on these factors, the Grids help the ALJ determine whether plaintiff can engage in any other substantial work that exists in the national economy. *Id.*

"Although the grids are 'generally dispositive, exclusive reliance on [them] is inappropriate' when they do not fully account for the claimant's limitations." *Martin v. Astrue*, 337 F. App'x 87, 90 (2d Cir. 2009) (citation omitted). When significant nonexertional impairments[10] are present or when exertional impairments do not fit squarely within Grid categories, the testimony of a vocational expert is required to support a finding of residual functional capacity for substantial gainful activity. *McConnell v. Astrue*, 6:03-CV-0521 (TJM), 2008 WL 833968, at *21 (N.D.N.Y. Mar. 27, 2008) (citing, *inter alia*, *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986).

---

[10] A "nonexertional" limitation is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only the claimant's ability to meet the demands of jobs other than the strength demands. 20 C.F.R. §§ 404.1569a(c), 416.969a(c).

### B.    Application

In this case, the ALJ found that plaintiff's nonexertional impairments did not significantly limit the plaintiff's ability to perform the full range of unskilled work at all exertional levels. (T. 21-22).  Thus, the ALJ utilized the Grid to determine that plaintiff was not disabled.  As stated above, the ALJ found that plaintiff could perform the "basic mental demands of unskilled work." (T. 21).  The ALJ's determination is supported by substantial evidence because the evidence supports the finding that plaintiff can understand, carry out, and remember simple instructions, and respond appropriately to supervision, co-workers, and usual work situations, and deal with changes in a routine work setting.  Thus, the ALJ's finding that plaintiff's disability ceased on July 31, 2015 is supported by substantial evidence.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the Commissioner's decision is **AFFIRMED**, and the complaint is **DISMISSED**, and it is

**ORDERED**, that the Clerk enter judgment for the **DEFENDANT.**

Dated: February 4, 2019

_____
**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**